UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                           :

MICHAEL L. PLOUFFE           :         3:10 CV 1548 (CSH)
                           :

V.                            :
                           :

MICHAEL J. ASTRUE,        :
COMMISSIONER OF SOCIAL SECURITY  :        DATE: AUGUST 4, 2011
                           :

-------------------------------------------------------- x

## RECOMMENDED RULING ON PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS AND ON DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

This action, filed under § 205(g) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), as amended, seeks review of a final decision by the Commissioner of Social Security ["SSA"] denying plaintiff disability insurance benefits ["DIB"] and supplemental security income benefits ["SSI"].

## I.  ADMINISTRATIVE PROCEEDINGS

On October 11, 2007,[1] plaintiff, Michael L. Plouffe, applied for DIB and SSI benefits, claiming that he has been disabled since January 18, 2007  due to sclerosing mesenteritis and disorders of his back. (Certified Transcript of Administrative Proceedings, dated November 23, 2010 ["Tr."] 98-108; see Tr. 141-53, 156-70, 173-82, 184). The Commissioner denied plaintiff's application initially, and again after review by a Federal Reviewing Officer. (Tr. 45-48, 58-64; see Tr. 43-44, 49-55, 187-96).  On December 5, 2008, plaintiff filed a request for a hearing before an Administrative Law Judge ["ALJ"] (Tr. 65-66; see Tr. 67-73), and on February 17, 2010, a hearing was held before ALJ Eileen Burlison, at which plaintiff testified.  ( Tr. 24-42; see Tr. 74-87, 96).  Plaintiff was represented by counsel.  (Tr. 56-57;

---

[1]Plaintiff's protective filing date was September 24, 2007.  (Tr. 142).

see Tr. 24, 197-98). On April 27, 2010, ALJ Burlison issued her decision in which she concluded that plaintiff is not disabled. (Tr. 4-17). On August 3, 2010, the SSA issued its Notice of Decision Review Board Action, informing plaintiff that it did not complete its review of plaintiff's claim during the ninety-day period, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3).

On September 30, 2010, plaintiff filed his complaint in this pending action, and thirteen days later, this case was referred from Senior United States District Judge Charles S. Haight, Jr. to this Magistrate Judge. (Dkt. #4). On January 7, 2011, defendant filed his answer. (Dkt. #10).[2] On February 4, 2011, plaintiff filed his Motion for Judgment on the Pleadings and brief in support (Dkt. #12),[3] and on April 29, 2011, defendant filed his Motion to Affirm the Decision of the Commissioner. (Dkt. #17; see Dkts. ##13-16). On May 11, 2011, plaintiff filed a reply brief. (Dkt. #18).

For the reasons stated below, plaintiff's Motion for Order to Reverse the Decision of the Commissioner (Dkt. #12) is granted, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #17) is denied.

## II. FACTUAL BACKGROUND

Plaintiff was born in 1980; he is thirty one years old (Tr. 27, 98, 141), and he lives at home with his father. (Tr. 29, 156, 515). He completed high school in 2002 and attended three years of college, and he received an emergency medical technician ["EMT"] certification in 1997. (Tr. 28, 152).

---

[2]Attached to defendant's answer was a certified copy of the two volume, 1,132 page administrative transcript, dated November 23, 2010. There is a fair amount of duplication of medical records in the administrative file. Two pages (Tr. 837-38) also relate to another person.

[3]Attached to plaintiff's Motion (Dkt. #12) is a copy of a Memorandum from Frank Cristaudo, Chief Administrative Law Judge, dated August 9, 2010. (Exh. A).

According to plaintiff, he is in "constant pain[,]" he is "very ill and fatigued all the time[,]" he cannot sleep from his pain, and physical activity increases his pain. (Tr. 146(emphasis omitted); <u>see</u> Tr. 29, 156, 159, 161, 190). It is painful for plaintiff to carry anything weighing more than twenty pounds, or lift anything more than forty pounds occasionally, he is uncomfortable when he is seated, although he reported that he could sit for an hour before having to change positions, it is painful to climb stairs or bend over, although he can do so occasionally, and he cannot walk or stand for any length of time before having to rest. (Tr. 157-58). Additionally, plaintiff reported that ascending from and descending to a kneeling position is painful, and reaching up high "created pain in [his] abdomen as it stretches." (<u>Id.</u>). According to plaintiff, his pain is distracting and it causes him to have difficulty understanding, paying attention, handling stress and handling changes in routine. (Tr. 159).

Plaintiff's illness does not affect his ability to manage his personal care (Tr. 161, 180), and he is able to feed his dog, although when he is not well, his father "[p]erforms basic care for him[.]" (Tr. 162). Additionally, plaintiff walks outside, is able to drive to his medical appointments if he feels well enough, can handle his own finances, can prepare his own meals, and can do laundry and "simple cleaning[,]" although his father sometimes helps him carry the laundry load. (Tr. 162-65). However, at the time of his hearing in 2010, plaintiff testified that he did not drive; he relies on rides from family and friends, and his parents do all of the cleaning and his laundry. (Tr. 31, 37). Plaintiff is not able to do yard work because of his pain (Tr. 165), and he does not shop unless "necessary." (Tr. 166; <u>see</u> Tr. 36-37). "[M]aybe once a month[,]" plaintiff socializes with friends over coffee, and he attends twelve-step meetings once a week, but he "rarely" does anything socially. (Tr. 167)(emphasis

omitted). Plaintiff reported that he used to be an "avid outdoorsman[,]" but he is unable to do those activities now. (Tr. 32, 169). Additionally, plaintiff enjoyed playing the guitar, but he no longer has any interest in his hobbies. (Tr. 32).

When plaintiff applied for benefits, the intake worker noted that plaintiff walked slowly into the office and even slower when he left; he shifted in his seat "a lot" during the interview; he winced in pain and was holding his left side "like he was hurting[,]'" and he took his time standing up after the interview was over. (Tr. 143)(emphasis omitted).

Plaintiff takes or has taken Cymbalta, Fentanyl, Oxycodone, Oxycontin, Thalidomide, Xanax, Percocet, Risperdal, Paxil, Tamoxifen, Prednisone, Topamax, Celebrex, and Ultracet. (Tr. 214, 216, 220, 613). He reported that his pain medication "makes [him] a little less able to focus" (Tr. 159), and they make him "a bit loopy and sleepy." (Tr. 35).

Plaintiff worked as a cashier full-time from 1996-97 and 2000-02. (Tr. 147; see Tr. 114-16.). From 1998-99 and again in 2002 to January 2007, plaintiff worked as an EMT (Tr. 147; see Tr. 117, 183), answering 911 calls, and assisting "people in distress." (Tr. 147)(emphasis omitted). In this job, he walked and stood for two hours in an eight-hour workday, and sat, climbed, stooped, kneeled, crouched, crawled, handled large objects, reached, and wrote, typed or handled small objects eight hours in the day. (Id.). According to plaintiff, the heaviest weight he lifted was five hundred pounds, and he frequently lifted two hundred and fifty pounds. (Tr. 147-48). In his work history report, plaintiff noted that prior to applying for disability benefits, he was out of work from American Ambulance on Family Medical Leave from January 18, 2007 to April 2007, and after that, he collected unemployment benefits from April 2007 to October 2007. (Tr. 131; see Tr. 28, 138, 168).

Plaintiff's medical records begin in February 2005 and reflect treatment from Dr. Jay

4

A. Graves at Sound Medical Associates for plaintiff's history of bipolar disorder and substance abuse. (Tr. 366, 369).[4] Dr. Graves saw plaintiff on December 9, 2005 for a back strain, at which time Dr. Graves provided a note to return to work. (Tr. 362).

On May 24, 2006, plaintiff was seen by Dr. Suresh D'Mello of Sound Medical complaining of pain on his tailbone due to a pea-sized cyst. (Tr. 358). Plaintiff was prescribed Paxil on July 6, 2006, and twenty-two days later, on July 28, 2006, plaintiff was seen by Dr. Graves for a refill of Paxil for his depression. (Tr. 357, 359).[5]

Plaintiff underwent an ECG on December 16, 2006 for chest pain (Tr. 296, 1132), and plaintiff was seen by Dr. Graves six days later for persistent dyspnea and abnormal liver enzymes for which plaintiff would need an abdominal ultrasound. (Tr. 350; see Tr. 351). On December 26, 2006, Dr. Graves cleared plaintiff to return to work. (Tr. 349).

Plaintiff saw Dr. Graves and had a chest x-ray on January 25, 2007 which was normal. (Tr. 269, 291, 344-45, 1127). Five days later, Dr. Graves wrote plaintiff a note that he could return to work in his usual capacity. (Tr. 343)

On February 2, 2007, plaintiff reported to Dr. D'Mello that he was "still not feeling

---

[4]Prior to that, on January 19, and 27, 2005, plaintiff was seen by Dr. Graves for cold and cough symptoms. (Tr. 368, 370). On February 17, 2005, plaintiff was seen for a congestion and ear pressure. (Tr. 367). Plaintiff did not return until June 3, 2005, when plaintiff underwent a physical for work, at which time he was in "[g]ood health." (Tr. 365). Plaintiff was seen by Dr. Graves on September 8, 2005 to discuss his medications, as he had lost his state coverage for medication; plaintiff was seen on September 21, 2005 for insomnia triggered by withdrawal from Risperdal; he was given Ativan. (Tr. 363-64). Plaintiff returned to Dr. Graves on January 25, 2006 and March 21, 2006 at which time he had sinus infections. (Tr. 360-61).

[5]Plaintiff was seen by Dr. Graves on August 14, for vomiting, on September 15, for a sore throat and smoking cessation, on September 18, 2006 for an upper respiratory infection, on October 24, 2006 for nausea, and on November 7, 2006 for abdominal pain and diarrhea. (Tr. 351-56).

Plaintiff was seen by Dr. Graves on January 8 and 16, 2007 for a cough and congestion. (Tr. 227-30, 346-47; see Tr. 348).

well" (Tr. 224), and four days later, plaintiff presented to Dr. Graves with persistent fatigue with myalgias and abdominal discomfort; he was taking Paxil and he appeared depressed. (Tr. 223, 342). He was seen again four days later. (Tr. 341; see also Tr. 241-46).

On February 21, 2007, plaintiff was seen by Dr. D'Mello for complaints of weakness, body aches, fatigue and abdominal pain. (Tr. 221; see Tr. 340). Four days later, plaintiff underwent a CT scan of his abdomen which revealed that plaintiff's liver was consistent with "diffuse fatty infiltration[,]" there was "stranding in the mesentery[]" and lymph nodes in the vicinity measuring up to 1.4 cm, which was diagnosed as "abnormal stranding in the mesentey" related to "mesenteric adenitis" or "severe duodentitis[,]" along with fatty infiltration of the liver, probable small left renal cyst and scarring at both lung bases. (Tr. 239-40, 267-68; see Tr. 337).[6]

On March 1, 2007, plaintiff was seen by Dr. D'Mello where he reported that he continued to "feel lousy" and he had tenderness in his abdomen. (Tr. 222). Dr. D'Mello excused plaintiff from work due to his illness. (Tr. 339). Eleven days later, plaintiff was seen at Coastal Digestive Diseases, P.C. by Dr. Mical Campbell "[f]eeling weak [and] fatigued[.]" (Tr. 304-05, 403-04, 547-49, 596-97; see Tr. 257-58). On March 16, 2007, Dr. Campbell diagnosed plaintiff with erythema, gastritis and a hiatal hernia after performing an EGD with biopsy. (Tr. 257-60, 539-40, 588-89; see Tr. 306, 315-17, 398, 400-01, 541-43, 590-92). On March 22, 2007, plaintiff was seen by Dr. D'Mello complaining of "a lot of epigastric [p]ain[.]" (Tr. 219, 336).

Plaintiff underwent an MRI of his lumbar spine on April 4, 2007, which showed a "[s]mall right paracentral L4 disc herniation[]" and "[m]ild bulging of L5 disc." (Tr. 266).

_____

[6] On February 25, 2007, plaintiff was seen by Dr. D'Mello recovering from pneumonia, and he complained of "feeling 'lousy[,]'" and tiring easily. (Tr. 225-26).

On April 10, 2007, plaintiff was seen by Dr. Gregory Azia for the pain in his left abdominal wall, which Dr. Azia opined may be related to plaintiff's L4-5 region disk disease. (Tr. 215). Eight days later, plaintiff was seen by Dr. Honghui Feng at the Lawrence and Memorial Hospital Pain Clinic for his history of low back pain, and left leg pain and numbness. (Tr. 256). Dr. Feng noted that plaintiff had been out of work for several months due to the severity of his abdominal pain. (Id.).

On May 10, 2007, plaintiff was seen at Sound Medical for a follow-up visit, during which plaintiff's low back pain, gastritis, anxiety/depression and obesity were noted. (Tr. 218, 234). Dr. D'Mello wrote plaintiff a note in which he stated that plaintiff became unable to work on April 12, 2007, but could return to work on "light duty." (Tr. 335). Plaintiff was seen by Dr. D'Mello again on May 31, 2007, at which time he complained of worsening pain. (Tr. 334).

Plaintiff underwent a CT scan of his abdomen on June 3, 2007, which revealed "[o]ne or two prominent adjacent lymph nodes" which had not changed significantly in size from the February 23, 2007 CT scan; the findings were "consistent with persistent inflammatory process or questionably infiltrating neoplastic region." (Tr. 235-36, 264-65; see Tr. 216, 333, 463). On June 6, 2007, plaintiff reported still feeling the "same" with "constant" left abdominal pain. (Tr. 306-07, 405-06, 549-50, 598–99). On June 18, 2007, Dr. Campbell performed a colonoscopy on plaintiff which showed "no evidence for inflammatory bowel disease or a process within the bowels[,]" although there were findings of "mesenteric process." (Tr. 254-55, 312-14, 396-97, 399, 445, 545-46, 593-95; see Tr. 306, 396-97, 727).[7] Two days later, Dr. Campbell performed a small bowel series radiology exam, the

---

[7] Plaintiff's preparation was "suboptimal" and a colonoscopy would have to be repeated in a year. (Tr. 254, 445; see also Tr. 396, 545).

results of which were in normal limits.  (Tr. 263, 318, 529, 544, 578).

Dr. Campbell saw plaintiff on July 4, when he noted that this was a "[v]ery unusual case[,]" and he returned on July 25 with complaints of worsened pain.  (Tr. 301).  In a letter dated July 16, 2007, Dr. David Reisfeld of General Surgery Associates of New London, P.C., informed Dr. Campbell that after reviewing two CT scans of plaintiff's abdomen, he found plaintiff's case to be "unusual" although he "believe[d] that the findings on the CT scan are the cause of [plaintiff's] chronic abdominal pain."  (Tr. 253, 728).

On August 1, 2007, Dr. Reisfeld performed an exploratory laparotomy and biopsy of a mesenteric mass on plaintiff at Lawrence and Memorial Hospital.  (Tr. 247-50, 288-90, 385-86, 535-36, 584-85, 1098-99, 1109-11, 1119-21; see Tr. 283-85, 292-95, 302, 387-88, 534, 537-38, 583, 586-87, 1108, 1114-18, 1122-24, 1128-31). Plaintiff remained hospitalized until August 8, 2007.  (Tr. 283).  After completing the laparotomy, Dr. Reisfeld noted that this was "quite [an] unusual case[]" (Tr. 247), and "[e]xtensive work up did not provide any etiology for the finding."  (Tr. 283).  The next day, Dr. Sudhir Kadian saw plaintiff, who was still hospitalized, for intractable abdominal pain.  (Tr. 251-52, 286-87, 1112-13).  Dr. Kadian noted that plaintiff had been "clean" from any substance abuse for the past three years, and he had been out of work due to severe abdominal pain.  (Id.).  Dr. Kadian recommended continuing Dilaudid PCA and adding Ativan for anxiety.  (Tr. 252, 287, 1113).

Plaintiff followed up with Dr. Campbell on August 16, 21 and 30, 2007, at which appointments he requested additional pain medication. (Tr. 302). On August 18, 2007, plaintiff presented to the Lawrence and Memorial Hospital emergency room to have his surgical sutures removed after he complained of pain. (Tr. 231-33, 270-82).

On September 4, 2007, Dr. Campbell noted that plaintiff was "[r]ecovering well." (Tr.

302).  Plaintiff was seen on September 5, 19, and 24, 2007 for continued complaints of pain; he was referred to a pain clinic and was prescribed Prednisone, Tamoxifen, and Oxycontin and Oxycodone for pain, although by October 4, 2007, his doctor expressed concern that plaintiff was taking too many narcotics.  (Tr. 308-09, 407-09, 551-52, 600-01).  On September 10, 2007, plaintiff was seen by Dr. D'Mello, at which time he was "feeling a lot better" while taking Tamoxifen, Prednisone, and Percocet for his pain. (Tr. 333, 463).  Plaintiff stopped Oxycontin by October 5, 2007, but continued on Oxycodone every four to six hours. (Tr. 310, 409, 553, 602).  However, treatment notes reflect that plaintiff continued to be prescribed both Oxycontin and Oxycodone through the month of October.  (Tr. 310-11, 409-10, 553-54, 602-03).

On October 31, 2007, Dr. Arthur Waldman completed a Physical Residual Functional Capacity Assessment (Tr. 321-28) of plaintiff for SSA, in which he opined that plaintiff could lift and/or carry ten pounds occasionally and frequently, he could stand or walk at least two hours in an eight-hour workday although he could not stand or walk more than four hours due to "pain/medication[,]" and  he could sit for six hours in an eight-hour workday.  (Tr. 322)(emphasis omitted).  Additionally, according to Dr. Waldman, plaintiff could occasionally climb, stoop, kneel, crouch, or crawl, but could never balance.  (Tr. 323).  Dr. Waldman based his RFC assessment on the "improved situation" from recent treatment of Tamoxifen and Prednisone.  (Tr. 326).  Dr. Waldman did not review any treating or examining source statements before reaching his RFC assessment.  (Tr. 327).[8]

On November 5, 2007, plaintiff was seen by Dr. Campbell for a follow-up; he was

---

[8]The next day, plaintiff was seen by Dr. Adam Gorelick of Connecticut Gastroenterology Associates Consultants, P.C., who thought plaintiff was supposed to see Dr. Fred Gorelick at Yale rather than him.  (Tr. 329).

"[s]till in pain" and taking Oxycodone and Oxycontin. (Tr. 411, 555, 604). Three days later, plaintiff was seen by Dr. D'Mello with "[p]ain all over" and "[s]evere" left flank pain. (Tr. 434-35; 459-60). Plaintiff underwent a chest x-ray on November 9, 2007, which revealed no evidence of acute pulmonary disease. (Tr. 377). Three days later, plaintiff returned to Dr. D'Mello with complaints of feeling "very weak"; the doctor noted severe tenderness at the left flank. (Tr. 436, 461).

On November 14, 2007, Conny Richard of CT Department of Disability Services completed a Report of Contact, in which he noted that plaintiff could not return to his past work and that he had the residual functional capacity to perform work at a sedentary level of exertion with the need to avoid climbing ladders, although he could occasionally climb ramps, balance, stoop, kneel, crouch, or crawl, and had to avoid all exposure to hazards. (Tr. 172).

Plaintiff returned to Dr. D'Mello on November 21, 2007 with worsening left flank pain. (Tr. 437, 462). On December 4, 2007, plaintiff underwent a CT scan of his abdomen, which revealed a "[s]oft tissue mass/infiltration of mesentary with adjacent mildly enlarged mesenteric nodes without significant change since prior study." (Tr. 375-76, 391-92, 426-27, 531-32, 580-82). Two days later, plaintiff was seen by Dr. D'Mello for a follow-up appointment during which he exhibited tenderness at the left flank; he was taking Oxycontin and Vicodin, which the doctor noted was "upsetting." (Tr. 433, 458).

On January 11, 2008, plaintiff was seen by Dr. Campbell; his pain was "worsening" and he was taking Oxycontin, Oxycodone, Prednisone and Tamoxifen. (Tr. 412, 556, 605). Five days later, plaintiff underwent a PET scan which showed the infiltrative mesenteric mass "essentially unchanged in size" which was "consistent with benign disease." (Tr. 390-91,

402, 423-24, 530, 579; see Tr. 425).  One week later, plaintiff was seen by Dr. D'Mello for his persistent pain, as well as a cough and congestion.  (Tr. 432, 457).  On January 21, 2008, plaintiff underwent a pentetreotide scan which revealed "[f]indings consistent with somatostatin avid tumor such as carcinoid in the region of the mesenteric mass posterior and in the inferior to the . . . transverse colon."  (Tr. 389, 393, 422, 485-86, 566-67, 574-75; see Tr. 413).  On January 24, 2008, Dr. Campbell authored a letter to plaintiff's counsel, in which he noted that he had been treating plaintiff since March 12, 2007 for abdominal pain that had been "proven" to be sclerosing mesentertis which can cause "severe abdominal pain and is quite difficult to treat."  (Tr. 383, 447, 726).   Dr. Campbell then opined that plaintiff is "totally disabled because of this condition."  (Id.).

Plaintiff was seen by Dr. D'Mello on February 6, 2008, at which time he complained that his "severe" abdominal pain "persist[ed,]" and he was "[v]ery weak".  (Tr. 431, 456).  Two days later, Dr. Campbell saw plaintiff who was in increased pain; Dr. Campbell referred plaintiff to the Mayo Clinic.  (Tr. 413-14, 557-58, 606-07).  On February 21, 2008, plaintiff presented to Dr. D'Mello with diffuse tenderness over the entire left side of his abdomen.  (Tr. 438-39, 454-55).  In a letter bearing the same date, Dr. Campbell informed Dr. D'Mello that the PET scan was consistent with benign disease and that he referred plaintiff to Dr. Brandt from Yale.  (Tr. 446, 725).

On March 4, 2008, plaintiff underwent another scan of his abdomen and pelvis, which revealed a "[s]table mesenteric mass and adjacent adenopathy."  (Tr. 394-95, 441-42, 487-88, 568-59, 576-77).  On March 10, 2008, Dr. Campbell was considering Thalidomide as a treatment for plaintiff's pain (Tr. 414, 607), and plaintiff returned ten days later to tell Dr. Campbell that the Mayo Clinic was not willing to take plaintiff as a "charity case."  (Tr. 414-

15, 558-59, 607-08). Dr. Campbell discussed the risks of Thalidomide and then gave him a prescription. (Tr. 415, 559, 608). On March 26, 2008, plaintiff was seen by Dr. D'Mello, who noted plaintiff's pain and "escalating use of narcotics." (Tr. 429-30, 452-53).[9]

On April 16, 2008, plaintiff was seen by Dr. D'Mello for his persistent abdominal pain, which was "still moderately severe," and plaintiff was "very depressed with [the] pain." (Tr. 450). Plaintiff returned for another abdominal scan nine days later, which results were "consistent with sclerosing mesenteric adenitis." (Tr. 443-44, 483-84, 572-73).

On April 30, 2008, Dr. D'Mello completed a Multiple Impairment Questionnaire of plaintiff for SSA. (Tr. 465-72; see Tr. 623-24). Dr. D'Mello noted that he had treated plaintiff monthly since March 2007 for sclerosing mesenteritis for which the prognosis was "[g]uarded[.]" (Tr. 465). Dr. D'Mello noted that plaintiff suffers from abdominal pain in his mid abdomen and at the left flank side, and there are CT scans supporting a diagnosis of sclerosing mesenteritis. (Tr. 465-66). Plaintiff's symptoms consist of abdominal pain, loss of appetite, weight loss, and fatigue, which are reasonably consistent with his impairment. (Tr. 466). Plaintiff's pain was characterized as severe central abdominal left flank and lower left quadrant pain, it was constant, and it was precipitated by movement and pressure. (Tr. 466-67). In Dr. D'Mello's opinion, plaintiff's pain ranged from moderate to severe, and his fatigue ranged from none to moderate. (Tr. 467). Dr. D'Mello had not been able to relieve plaintiff's pain with medication and plaintiff could sit for only one hour a day, or stand for less than an hour as it would be "necessary or medically recommended" for plaintiff "not to sit[, stand or walk] continuously in work setting[.]" (Tr. 467-68). Plaintiff could occasionally lift five pounds of less, and carry ten pounds or less, but he could never lift or carry weight

---

[9]On April 3, 2008, plaintiff was seen by Dr. D'Mello for a sinus infection. (Tr. 428, 451).

greater than that, and lifting and reaching would be a "problem" for plaintiff. (Tr. 468). According to Dr. D'Mello, plaintiff would be moderately to minimally limited in his ability to use his arms for reaching, and he would not be limited in his ability to perform fine manipulations. (Tr. 468-69). At the time Dr. D'Mello completed this assessment, plaintiff was taking Oxycontin, Oxycodone, Paxil, Thalidomide, and Xanax. (Tr. 469). Dr. D'Mello opined that plaintiff's symptoms would increase if he were placed in a competitive work environment, he experienced pain "[c]onstantly" such that he also suffered from anxiety and depression, and he would need to take unscheduled breaks hourly for ten minutes each. (Tr. 470). Additionally, Dr. D'Mello concluded that plaintiff would not be able to push, pull, bend or stoop, although he also opined that plaintiff could handle moderate stress. (Tr. 470-71).

Plaintiff was seen by Dr. D'Mello on May 7, 21 and 30, 2008 with complaints of severe abdominal pain and anxiety and depression. (Tr. 449, 622-23). On May 21, plaintiff reported that he was "[d]oing better[,]" although his anxiety levels were high and he was on "high doses" of Oxycontin. (Tr. 622).

On June 3, 2008, Dr. Herbert A. Kushner completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical), in which he concluded that plaintiff could frequently lift and carry up to ten pounds and could occasionally lift and carry up to twenty pounds; plaintiff could sit for four hours, stand for one hour and walk for thirty minutes at a time, and could sit for six hours, stand for two hours and walk for one hour in an eight hour workday. (Tr. 474-75). Additionally, according to Dr. Kushner, plaintiff could climb stairs, balance, stoop, kneel, crouch and crawl occasionally, and could never climb ladders and scaffolds. (Tr. 477). Plaintiff could frequently move mechanical parts, operate a motor vehicle, be in humidity, wetness, dust, odors, fumes and extreme cold, but could only occasionally be exposed to extreme heat and could never be in unprotected heights. (Tr.

13

478). Plaintiff could tolerate moderate office noise and could shop, travel, ambulate, walk a block, use public transportation, climb a few steps, prepare simple meals, care of his personal hygiene, and sort, handle, and use paper files. (Tr. 479).

Plaintiff saw Dr. D'Mello on June 8, 2008, who prescribed Oxycontin and Vicodin for plaintiff's pain. (Tr. 621). Plaintiff returned ten days later and Dr. D'Mello noted that he was continuing plaintiff on pain medications including Thalidomide, Prednisone and Tamoxifen. (Tr. 620).

On June 26, 2008, plaintiff was seen for a follow-up visit with Dr. Campbell at which time plaintiff was having difficultly eating; Dr. Campbell's impression was that plaintiff was suffering from sclerosing mesenteritis and "Thalidomide residual side effects." (Tr. 482, 563, 571). On July 11 and 17, 2008, plaintiff returned to Dr. D'Mello, who noted that plaintiff's pain was decreasing on Thalidomide, although he was "[v]ery fatigued" and he still had pain, anxiety and depression. (Tr. 618-19; see also Tr. 625-26). On July 21, 2008, plaintiff sought additional Oxycontin from Dr. D'Mello by claiming that his pills were stolen from his car; Dr. D'Mello's response was "[t]oo [b]ad." (Tr. 618). Later that day, plaintiff appeared at the emergency room of Lawrence and Memorial Hospital with suicidal ideation and depression secondary to his medication loss where he spent the night before being transferred for in-patient treatment. (Tr. 1092-96, 1101-07; see Tr. 1090-91).

The next day, plaintiff was admitted to the Natchaug Hospital for six days for abuse of Oxycontin. (Tr. 490-528). Plaintiff reported that he became agitated and suicidal after Dr. D'Mello refused to refill a prescription of Oxycontin for plaintiff after he claimed the pills were stolen from his car. (Tr. 490, 498, 514, 519). Plaintiff described his reaction as a "cry for help." (Tr. 490-91, 498-99). Plaintiff's Axis I diagnosis upon admission was opiate dependence, opiate withdrawal, and adjustment disorder with anxiety, and plaintiff was

14

assigned a GAF score of 35.  (Tr. 491, 499; but see Tr. 494 (GAF of 30); see Tr. 511, 513, 521).  While plaintiff had a history of substance abuse, he had been clean for five years and prior to this incident, plaintiff did not have any psychiatric treatment.  (Tr. 490, 498, 505, 507, 516, 518). Plaintiff reported his history of a "stomach tumor" and chronic abdominal pain.  (Tr. 496, 527; see Tr. 508, 519, 524).  Plaintiff was placed on a detoxification regime of Seroquel, Oxycodone, Clonidine, Motrin and Cymbalta.  (Tr. 491, 495, 497, 498, 503, 522).  Plaintiff was alert but not focused, his fund of knowledge and concentration were intact and he was not psychotic, nor did he have suicidal or homicidal thoughts.  (Tr. 510-11).  Plaintiff experienced cold sweats, anxiety and aches and pains while he was detoxed to 5 mg of Oxycontin.  (Tr. 491, 497, 498, 512).   It is noted in the hospital records that plaintiff ambulated with a cane.  (Tr. 490-91, 498-99).

Upon discharge, plaintiff received the same diagnoses as upon admission but his GAF score was raised to 42 or 45.  (Tr. 492-94, 499-502).  His levels of depression "appeared manageable and fairly low."  (Tr. 492, 500). On July 30, 2008, plaintiff saw Dr. D'Mello for complaints of persistent pain, "but not as severe as it was prior to Thalidomide[.]" (Tr. 617). Plaintiff returned to Dr. D'Mello on August 7 and 13, 2008 for his sclerosing mesenteritis, abdominal pain, and anxiety and depression, during which visits Dr. D'Mello noted plaintiff's continuing pain and tenderness and he prescribed Oxycodone.  (Tr. 614-16).[10]

Plaintiff was admitted to Middlesex Hospital on August 31, 2008, where he stayed until September 4, 2008 for treatment for severe major depression disorder recurrent.  (Tr. 629-74, 682-88, 691-94, 696-700).  Plaintiff had attempted suicide by taking forty tablets of Oxycontin to escape from his "chronic pain[,]" and plaintiff wrote a suicide note to his father.

---

[10]Plaintiff underwent blood work on August 16, 2008.  (Tr. 373-74).

(Tr. 638, 640, 682, 691; see Tr. 645, 655, 658, 682, 686, 688, 691, 693; see also Tr. 212-13).  Plaintiff stated that he only felt suicidal when his pain was out of control (Tr. 644, 647; see Tr. 648, 682, 686, 688), and he stated that he missed working and missed living a regular life.  (Tr. 682).  Plaintiff was diagnosed with major depressive disorder, single episode severe, opioid abuse, sclerosing mesenteritis, and chronic pain syndrome, and he was assigned a current GAF of 15 or 28.  (Tr. 648, 662, 670, 682, 688).  During the course of his hospitalization, plaintiff reported severe abdominal pain, an inability to sleep, and depression.  (Tr. 655-61; see also Tr. 663, 683-84).[11]  Plaintiff also reported that he "actually [felt] he was depressed for quite some time prior to developing the sclerosing mesenteritis[,]" and that when he began using drugs, he felt "more depressed[.]" (Tr. 684).

Three days after he was discharged, plaintiff returned to Middlesex Hospital with complaints of abdominal pain and he reported that he knew that it was important for him to take his pain medication in the proper dose such that he did not take extra doses to alleviate his pain.  (Tr. 676, 689; see Tr. 676-81, 689-90, 694). Plaintiff was in moderate distress and his abdomen was soft and tender.   (Tr. 677, 679).  He was given two Dilaudid tablets and told to follow up with Dr. D'Mello.  (Tr. 677, 681, 689).  Plaintiff was seen by Dr. D'Mello on September 5, 2008, when plaintiff reported that he continued to have "severe" abdominal pain, and he returned on September 13 and 18, at which time he was depressed because of his pain, which he described as "unbearable[.]" (Tr. 717-19, 721-22).[12]  Dr. D'Mello felt he was "not competent enough to help with [plaintiff's] pain management[.]" (Tr. 717).  On September 13, 2008, plaintiff underwent another biopsy; in the surgical pathology consult

_____

[11]Plaintiff had been attending Narcotics Anonymous regularly until shortly before this overdose.  (Tr. 658).

[12]Plaintiff underwent blood work on September 10, 2008.  (Tr. 711).

report, Dr. Martin Floch indicated that the biopsies showed a "differential diagnosis" that included fibromatosis," but the "overall features [were] more consistent with sclerosing mesenteritis." (Tr. 1125).

On October 20, 2008, Dr. D'Mello noted that plaintiff was "exhausted" and depressed from his pain; he also noted chronic back pain. (Tr. 716; <u>see also</u> Tr. 705-10). Two days later, plaintiff underwent another CT scan of his abdomen and pelvis in which the central mesentery appeared stable; the findings were consistent with sclerosing mesenteric adenitis. (Tr. 702-03). Plaintiff was seen by Dr. D'Mello on November 10, 2007, at which time he was on Oxycodone and Oxycontin for his pain. (Tr. 714).

Plaintiff saw Dr. D'Mello on December 10, 2008 after being in the emergency room the day before with abdominal pain. (Tr. 712; <u>see</u> Tr. 704, 723). On December 31, 2008, plaintiff returned to Dr. D'Mello for "worsening" abdominal pain and a sinus headache. (Tr. 713). Plaintiff had tenderness on the left side of his abdomen. (<u>Id.</u>)

Plaintiff was seen by Dr. D'Mello on January 7, 2009, at which time the pain was accelerating, and on January 29, 2009, plaintiff was "no better[.]" (Tr. 735-36). On January 13, 2009, plaintiff was seen by Dr. Martin Floch of Yale Internal Medicine, who referred plaintiff for a gastrointestinal surgical consult. (Tr. 835-36).

Plaintiff attended weekly therapy sessions with Richard Sugarman, L.C.S.W., from January 20, 2009 through November 5, 2009 (Tr. 737-823, 846-906),[13] and during the course of his sessions, plaintiff discussed sleep disturbance (Tr. 750-51, 770, 789, 795, 848, 860, 864, 868, 879; <u>see</u> Tr. 807, 812, 902), his pain (Tr. 777, 793-95, 814, 816, 859, 879, 889,

---

[13]In his initial intake form, plaintiff described his reason for seeking therapy as follows: "[s]teadily increasing depression for [six] years, culminating in severe clinical depression diagnosis on 8/08 and suicide attempts in 7/08, 8/08[.]" (Tr. 806). Plaintiff correlated his drug use with his pain level. (<u>Id.</u>).

996-97, 902), his reliance on opioids for pain management and the resulting drug dependence (Tr. 752, 754-56, 759-62, 781, 786, 788-89, 821-22, 869-71, 882-83, 892, 894-97; see Tr. 810, 858, 865-67, 873-75), his earlier battle with drug abuse, and his present use of drugs (Tr. 783-84, 819-21, 856-57, 890-91), his loneliness (Tr. 811, 819), his weight loss (Tr. 754), his lack of foresight (Tr. 757), his suicidal thoughts and actions (Tr. 787, 872, 897-99),[14] his lethargy, depression and lack of motivation (Tr. 787-88, 847, 859), his relationship with his father (Tr. 770-72, 777-81, 791-92, 849-51; see Tr. 808-09), his hallucinations of paranormal activity (Tr. 764, 772-75), his dreams (Tr. 782-83, 788, 854-55, 861), his relationships (Tr. 797-801, 803-05, 813, 855-56, 876-77, 885-86; see Tr. 810), and his expectation of surgical relief. (Tr. 783, 786, 790-91, 795-96, 879-80, 884, 887, 900-03).[15]

On January 24, 2009, plaintiff underwent an MRI at Yale-New Haven Hospital of his abdomen and pelvis, which revealed a 6.5 x 2.8 cm "irregularly infiltrating mass" that "likely correspond[ed] to the sclerosing mesenteritis". (Tr. 827-28, 839-40). On February 2, 2009, Dr. Campbell performed a colonoscopy, after which he noted "[v]ery poor preparation. The exam should be repeated." (Tr. 1089; see Tr. 724, 1085-088).

Plaintiff returned to Dr. Floch on March 17, 2009, who opined that plaintiff's "pain [was] poorly maintained on a daily regime of OxyContin and oxycodone[,]" and he noted there remained the question as to whether there was a component of psychiatric disease making the pain worse. (Tr. 834). On April 9, 2009, plaintiff was seen by Dr. Charles Cha,

---

[14]On June 17, 2009, plaintiff related a recent suicide attempt, in which he left a suicide note for his parents and then placed himself on the railroad tracks behind his home, and rolled off the tracks when he saw "the engineer's horrified face[.]" (Tr. 897-98). He expressed shame that he "almost killed [himself] which is totally selfish." (Tr. 898).

[15]On February 22, 2009, plaintiff discussed his "crushing depression which far-preceded this illness." (Tr. 796)(emphasis in original).

Additionally, plaintiff spoke of his guitar playing. (Tr. 801-02).

an assistant professor of surgery in the Gastrointestinal Surgery and Surgical Oncology Department of Yale-New Haven Hospital (Tr. 829-30), who opined that he would "avoid surgery unless emergent[]" because only about ten percent of patients benefit from the surgery, he was "not confident" that he would be able to palliate symptoms of pain, and there would be a high risk of surgical complications. (Tr. 830). He referred plaintiff for pain management and considered the use of chemotherapy as a treatment. (Id.).[16] On April 17 and 29, 2009, plaintiff was seen by Dr. D'Mello for severe pain and tenderness in the left flank area. (Tr. 733-34; see also Tr. 729-31).

On May 13, 2009, Sugarman completed a Psychiatric/Psychosocial Impairment Questionnaire for SSA (Tr. 737-44),[17] in which he noted plaintiff's diagnoses of opioid and alcohol dependence, sclerosing mesenteritis, and major depression about both illnesses, and he assigned plaintiff a GAF score of +/- 35. (Tr. 737). Sugarman's prognosis was that "[i]f sclerosing mesenteritis is treatable, fair to good for the depression[, and] [i]f not, suicide is highly probable. Either way, opioid alcohol dependence [would] be a life-long challenge." (Id.)(emphasis in original). Sugarman characterized plaintiff's clinical findings supporting his diagnosis as appetite disturbance with weight change, sleep and mood disturbance, emotional lability, substance dependence, anhedonia, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy and generalized persistent anxiety. (Tr. 738). Sugarman noted no evidence of limitation in plaintiff's ability to carry out simple one or two-step instructions, work in coordination with others, make simple work related decisions, interact with the

---

[16]Plaintiff underwent blood work on April 25, 2009. (Tr. 1081-84).

[17]This form was cosigned by a local psychologist, Dr. Pamela Julien. (Tr. 744).

public, ask simple questions, accept instructions, get along with co-workers, respond appropriately to changes in the workplace, and be aware of hazards or travel; however, Sugarman rated plaintiff as markedly limited in his ability to complete a normal work week without interruptions from psychologically based symptoms, to perform at a consistent pace, and to set realistic goals or make plans independently. (Tr. 740-42). Sugarman noted that plaintiff was "wracked with intense physical pain, obsessed with trying to numb it, [and] preoccupied with thoughts of suicide." (Tr. 742). Additionally, Sugarman noted that plaintiff was incapable of low stress jobs if his physical pain was a six or seven on a scale of ten, "which [was] common[,]" as "[e]xtreme physical pain leads him to drug-seeking behavior, followed by over-use of pain med[ication]"; plaintiff was capable of moderate stress jobs if his pain was a four or less, "which [was] rare[.]" (Tr. 743). Sugarman concluded that if plaintiff's physical condition was "successfully treated (and no cure currently exists)[,] he [would] only be challenged by his opioid dependence[, but] [i]f the sclerosing mesenteritis [could not] be stopped from progressing, and the pain can't be managed[,] [plaintiff's] <u>next</u> suicide attempt . . . will most likely kill him." (Tr. 744)(emphasis in original). He also estimated that plaintiff would be absent from work more than three days a month. (<u>Id.</u>).

Plaintiff returned to Dr. Cha on May 28, 2009, after an octreocide scan was performed, and Dr. Cha discussed the possibility of proceeding with open surgical biopsy of the area; Dr. Cha had consulted with Dr. Pardi at the Mayo Clinic, "who is a[n] expert on sclerosing mesenteritis." (Tr. 831). On June 22, 2009, plaintiff underwent a CT scan of his abdomen for Dr. Cha, which revealed thick irregular infiltration of the mesenteric fat without interval change, and fat containing abdominal wall hernias. (Tr. 832, 841). Three days later, an octreotide scan was performed. (Tr. 833, 842-43).

Plaintiff presented to the emergency room at Lawrence and Memorial Hospital on July

12, 2009, with complaints of depression with suicidal ideation; plaintiff reported that he was "constantly think[ing] about ways to kill himself." (Tr. 1057, 1061, 1064, 1068, 1075; <u>see</u> Tr. 1056-80).[18]  Plaintiff reported that he was unable to work due to his pain, and he had multiple plans for suicide.  (Tr. 1057, 1075, 1079).  Additionally, he reported a "life-long dysphoric mood" and a history of bipolar disorder. (Tr. 1058).  Plaintiff was diagnosed with mood disorder due to his medical condition, polysubstance dependence; and sclerosing mesenteritis; and he was assigned a GAF of 25.  (Tr. 1059, 1066, 1080).  Plaintiff was admitted to Pond House "4" for "safety and observation"  (Tr. 1080), where he remained until July 16, 2009.  (<u>See</u> Tr. 1057).

Dr. D'Mello saw plaintiff on July 21, 2009 following his stay at Pond House; plaintiff stated he was always in pain and was fatigued, and Dr. D'Mello noted plaintiff's depression, left flank tenderness, and his need for pain management.  (Tr. 922).  Six days later, plaintiff returned to the emergency room of Lawrence and Memorial Hospital with complaints of narcotics withdrawal after throwing away his "entire supply" the day before.  (Tr. 1045; <u>see</u> Tr. 1045-55).  No opiate detox facilities would admit plaintiff for inpatient care, and Dr. D'Mello recommended restarting plaintiff on Oxycontin and Methadone.  (<u>Tr. 1045</u>). Plaintiff reported that he felt like he was becoming addicted to the pain medication and the medication did not do a "good job of relieving his pain."  (Tr. 1049).

Plaintiff was seen by Dr. D'Mello on August 7, 2009 for his "accelerating" pain. (Tr. 824).  On August 26, 2009, plaintiff presented to the Lawrence and Memorial Hospital emergency room with depression and suicidal ideation "attributed to chronic pain." (Tr. 990-91; <u>see also</u> Tr. 992-1037).  Plaintiff was sleep-deprived, he ran out of Vicodin and

_____

[18]As of spring or summer 2009, plaintiff had lost sixty pounds since 2007.  (Tr. 1070; <u>see also</u> Tr. 814).

threatened to kill himself because of the pain (Tr. 1019; see Tr. 1024-25); specifically, plaintiff reported a plan to use a knife to kill himself. (Tr. 998, 1008). He left the emergency room and returned later that evening after realizing that he "couldn't stop obsessing about the knife on [his] desk[,]" and his intense urge "to cut[.]" (Tr. 1008; see Tr. 1022-23). He was diagnosed with depressive disorder, not otherwise specified, opiate dependence; carcinoid tumor, sclerosing mesenteritis, and chronic abdominal pain; disruption due to chronic pain; and he was assigned a GAF of 25 upon admission and 55 upon discharge. (Tr. 992; see Tr. 1004, 1017, 1037).[19] Plaintiff was treated with Oxycontin (Tr. 994, 1001-02, 1027), and discharged on August 27, 2009. (Tr. 1020, 1025-26).

On September 8, 2009, Dr. D'Mello authored a note in which he opined that plaintiff's symptoms "are constantly severe enough to interfere with his abilities for attention and concentration[,]" and if he were "placed in a competitive work setting, his symptoms would likely increase." (Tr. 845). Additionally, plaintiff was limited to sitting and stand/walking a maximum of one hour each in an eight hour workday and he cannot push, pull, bend or stoop, and he had significant problems lifting and reaching with his bilateral upper extremities. (Id.). Dr. D'Mello continued that due to plaintiff's fatigue, he must take hourly rest breaks, and he would be absent "more than [t ]here[.]" (Id.). Dr. D'Mello also noted that plaintiff's "medical status has also produced anxiety and depression" and plaintiff would be unable to sustain a competitive full time job. (Id.).[20]

---

[19]While hospitalized, plaintiff was seen by Dr. Laurence Radin for right fifth finger numbness, which Dr. Radin opined was "probable distal ulnar nerve injury, possible digital neuropathy." (Tr. 1006).

[20]Six days earlier, on September 2, 2009, Sugarman also sent a note, cosigned by Dr. Julien, and that Sugarman's "best medical opinion" is that plaintiff "is totally disabled without consideration of any past or present drug and/or alcohol use." (Tr. 844).

Dr. Kisha Mitchell at Yale-New Haven Hospital reviewed plaintiff's biopsies on September 13, 2009 and concluded that the "overall features [were] more consistent with sclerosing mesenteritis." (Tr. 826). On September 27, 2009, Dr. D'Mello noted that plaintiff would discontinue Oxycodone, stay on Oxycontin 20mg, and would start taking Methadone for his pain. (Tr. 919).

In a letter to Dr. Pardi, dated November 5, 2009, Sugarman reported that while plaintiff had a history of heroin and cocaine addiction before his sclerosing mesenteritis diagnosis, from which he "got [] clean[,]" he had "relapsed into opiates-abuse . . . to deal with his new pain" from sclerosing mesenteritis. (Tr. 905). Sugarman opined that he was "fairly confident, after forty years as a trauma therapist, that if [plaintiff's sclerosing mesenteritis] can't be satisfactorily treated, his addict's personality WILL take him down in the very near future." (Tr. 906)(emphasis in original). The next day, plaintiff contacted Dr. D'Mello requesting to switch from Oxycodone to Methadone; he was given Ultracet and Klonopin. (Tr. 918). On November 13, 2009, Dr. D'Mello noted plaintiff's "chronic pain syndrome[,]" and noted that in addition to Oxycodone and Oxycontin, plaintiff was taking Buspar, Cymbalta, and Klonopin. (Tr. 920-21). Just over one week later, plaintiff returned to report that Methadone was "not helping." (Tr. 917).

On November 29, 2009, plaintiff was admitted to Lawrence and Memorial Hospital after he experienced "increasing depression and suicidal ideation with plan," where he stayed until December 4, 2009. (Tr. 907-14, 960-89). Plaintiff relapsed in his alcohol abuse, wrote a suicide note to his father, found a rope, went to a secluded spot and hung it from a tree branch, then tied it around his neck and jumped, but the tree branch snapped and released him to the ground. (Tr. 965, 969-70, 972, 976, 983). Plaintiff thought he would try to "finish[ ] the job" that night with a different tree branch but instead presented to the

23

emergency room.  (Tr. 965, 969, 972, 983).   Plaintiff also had superficial abrasions to his bilateral wrists which were self inflicted over the prior two days.  (Tr. 966, 970).  Plaintiff reported that he could not "stand to live with his chronic pain any longer[.]" (Tr. 970).[21] During the course of the hospitalization, plaintiff was "maintained on his outpatient medicines" and he was "pleasant, almost too pleasant on the unit," and "cooperative[.]" (Tr. 907, 962).  Dr. Douglas M. Brandt noted that "[w]hat [was] complicated with this man is that he ha[d] legitimate pain, but also significant addictions[,]" and he was taking Oxycontin 30 mg in the morning and 20 mg at noon, as well as Oxycodone twice a day for breakthrough pain, and Cymbalta, BuSpar, and Compazine.  (Tr. 907, 962; see Tr. 910-12, 974-75).  Prior to discharge, a search of his room turned up a syringe and spoon, which Dr. Brandt felt plaintiff was using to "cheek[ ] his OxyContin, crushing it in a spoon and then injecting it either subcutaneously or intravenously." (Tr. 907-08, 962-63).  Plaintiff was diagnosed with mood disorder "[d]ue [t]o [m]edical [c]ondition," rule out major depression, recurrent, moderate, alcohol abuse, opiate dependence; deferred, rule out antisocial personality traits; sclerosing mesenteritis and chronic pain secondary to above; stressors- moderately severe including medical pain and addiction issues; and he was assigned a GAF of 25-30 upon admission and 45-50 upon discharge.  (Tr. 907, 909, 962; see Tr. 962, 987).[22]    Five days after his discharge, plaintiff was seen by Dr. D'Mello for his pain associated with his sclerosing mesenteritis.  (Tr. 916).   Plaintiff was hospitalized at Lawrence and Memorial from January 9 to January 13, 2010, for overdosing on Klonopin "after getting angry at his parents[.]" (Tr. 923; see Tr. 923-59). He was diagnosed with major depression disorder,

---

[21]He also reported that he is unable to work due to his chronic pain.  (Tr. 985).

[22]Plaintiff also reported that his pain is from "stomach cancer."  (Tr. 965-66, 969, 972-73).

recurrent without psychotic features; personality disorder, NOS; carcinoid tumor and sclerosing mesenteritis; financial concerns, primary support system, chronic mental illness and chronic medical issues; and he was assigned a GAF of 30. (Tr. 945; <u>see</u> Tr. 947, 959). Plaintiff admitted that "he knew that the Klonopin would not kill him, but that he wanted his family to feel bad for him." (Tr. 943). He relayed that his stressors included feeling like he was a burden to his family, the fact that he had been denied disability benefits, the fact that his father had said that he needed to declare bankruptcy because of the financial burden plaintiff has placed on him, the fact that plaintiff's father may lose his house if plaintiff was not granted disability benefits, and his concern for his sister and nephew. (Tr. 943; <u>see</u> Tr. 954, 956). Dr. D'Mello informed Dr. Brandt that plaintiff had a "habit of overusing his medicine and then there is some sort of crisis[,]" but Dr. Brandt also noted that plaintiff is "highly intelligent, and he did have a good work history, and he does have an illness that does cause chronic pain[,]" but "[t]hat being said, he does indeed have addiction problems as well." (Tr. 923-24). Plaintiff was discharged with "suicidal risk factors" and he was scheduled to return to Sugarman and Dr. D'Mello. (Tr. 924).

On February 17, 2010, plaintiff testified at a hearing before ALJ Burlison. (Tr. 24-42). According to plaintiff, he quit smoking, and he has not drank, with the exception of two incidents, for the past five years. (Tr. 32). Plaintiff testified that his pain is "sharp, chronic, constant pain[,]" in response to which the ALJ stated "And . . . you've had multiple tests that have come up pretty normal?" (Tr. 33). Plaintiff clarified that he has been diagnosed with sclerosing mesenteritis and his doctors have been trying with "many different medications to try to stop the progression of the necrosis . . . " as surgery is "too dangerous." (<u>Id.</u>).

Plaintiff also testified that he does not "enjoy anything any longer[,]" and he is "not sure" that his psychiatric medications are helpful. (Tr. 34). Additionally, according to

plaintiff, it is painful for him to walk so he cannot walk for very long or very far, he can sit for a "reasonable length of time[,]" and standing is "as bad as walking[.]" (Tr. 36). Plaintiff opined that he could lift less than twenty pounds "if really necessary[,]" although he tried to avoid lifting anything over more than five pounds. (Id.).

Plaintiff testified that his "major problems" are depression, suicidal thinking, his pain, and the weakness and fatigue from his physical illness. (Tr. 37). While plaintiff reads, he is often distracted by the pain and has to "go back and re-read" several times. (Tr. 38). According to plaintiff, he would "probably" have four bad days out of seven days, and there are days he is unable to take care of himself, such that he only showers or bathes two or three times a week. (Id.). Plaintiff also testified that he has problems sleeping, and his pain can get to a six; plaintiff acknowledged "that a lot of people would just say ten, but being an EMT, [he has] a more realistic approach to the pain scale and for [him] six is quite horrible." (Tr. 39). The pain medications reduce his pain to a three or four which is a level that is "barely tolerable" such that he can function "[m]inimally[.]" (Id.). Additionally, according to plaintiff, he sobs "uncontrollably for no apparent reason[,] just feeling overwhelmed and helpless[.]" (Tr. 40).

### III.  STANDARD OF REVIEW

The scope of review of a Social Security disability determination involves two levels of inquiry.  First, the court must decide whether the Commissioner applied the correct legal principles in making the determination.   Second, the court must decide whether the determination is supported by substantial evidence.  See Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)(citation omitted).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971)(citation omitted); see Yancey v. Apfel, 145

F.3d 106, 111 (2d Cir. 1998)(citation omitted).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  See Gonzalez v. Apfel, 23 F. Supp.2d 179, 189 (D. Conn. 1998)(citation omitted); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977)(citations omitted).  However, the court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  See Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993)(citation omitted).  Instead, the court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  See id. Furthermore, the Commissioner's findings are conclusive if supported by substantial evidence and should be upheld even in those cases where the reviewing court might have found otherwise.  See 42 U.S.C. § 405(g); see also Beauvoir v. Charter, 104 F.3d 1432, 1433 (2d Cir. 1997)(citation omitted).

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits.  See  42 U.S.C. § 423(a)(1).  "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1).

Determining whether a claimant is disabled requires a five-step process.  See 20 C.F.R. § 404.1520.  First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a).  If the claimant is currently employed, the claim is denied.  See 20 C.F.R. § 404.1520(b).  If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied.  See 20 C.F.R. § 404.1520(c).  If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in

Appendix 1 of the Regulations [the "Listings"].  See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137, 141 (1987); Balsamo, 142 F.3d at 79-80.  If the claimant's impairment meets or equals one of the impairments in the Listings, the claimant is automatically considered disabled.  See 20 C.F.R. § 404.1520(d); see also Balsamo, 142 F.3d at 80.  If the claimant's impairment does not meet or equal one of the listed impairments, as a fourth step, he will have to show that he cannot perform his former work.  See 20 C.F.R. § 404.1520(e).  If the claimant shows he cannot perform his former work, the burden shifts to the Commissioner to show that the claimant can perform other gainful work.  See Balsamo, 142 F.3d at 80 (citations omitted).  Accordingly, a claimant is entitled to receive disability benefits only if he shows he cannot perform his former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment.  See 20 C.F.R. § 404.1520(f); see also Balsamo, 142 F.3d at 80 (citations omitted).

The Commissioner may show a claimant's Residual Functional Capacity ["RFC"] by using guidelines ["the Grid"].  The Grid places claimants with severe exertional impairments, who can no longer perform past work, into employment categories according to their physical strength, age, education, and work experience; the Grid is used to dictate a conclusion of disabled or not disabled.  See 20 C.F.R. § 416.945(a)(defining "residual functional capacity" as the level of work a claimant is still able to do despite his or her physical or mental limitations).  A proper application of the Grid makes vocational testing unnecessary.  However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered.  See 20 C.F.R. § 200.00(e)(2).  If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally

required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)(citing Bapp v. Bowen, 802 F.2d 601, 604-05 (2d Cir. 1986)).

## IV. DISCUSSION

ALJ Burlison found that plaintiff has not engaged in any substantial gainful activity since January 18, 2007, the alleged onset date, and plaintiff has the following severe impairments: sclerosing mesenteritis, depression NOS, and polysubstance abuse in partial remission, none of which meets or medically equals one of the listing impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 9-11; see 20 C.F.R. §§ 404.1571 et seq., 416.971 et seq., 404.1520(c), 416.920(c), 404.1520(d), 404.1525, 404.1526, 416. 920(d), 416.925, and 416.926). The ALJ then concluded that plaintiff has the RFC to lift and carry ten pounds occasionally and frequently, he can walk and/or stand for up to two hours and sit for approximately six hours of an eight-hour work day, he is limited to jobs that do not require climbing, and he must avoid hazardous conditions, such as working at heights and operating dangerous, moving machinery. (Tr. 11-15; see 20 C.F.R. §§ 404.1567(a) and 416.967(a)). The ALJ found that plaintiff is unable to perform any past relevant work as a cashier, EMT or computer information technologist, and under the Medical-Vocational Guidelines, plaintiff is able to perform unskilled sedentary work, and thus, a finding of not disabled is appropriate. (Tr. 15-16; see 20 C.F.R. §§ 404.1565, 416.965, 404.1563, 416.963, 404.1569, 404.1569(a), 416.969, 416.969(a), 404.1520(g), 416.920(g) and 20 C.F.R. Part 404, Subpart P, App. 2).

Plaintiff contends that the ALJ failed to follow the treating physician rule but instead gave "substantial weight" to the opinion of the non-examining medical consultant, Dr. Kushner, and failed to offer "'good reasons,' or any reasons for that matter, for not crediting

[the treating physicians' opinions]" (Dkt. #12, Brief at 15-18); the ALJ failed to properly evaluate plaintiff's mental impairment (id. at 18-21); the ALJ failed to properly evaluate plaintiff's credibility (id. at 21-23); and the ALJ erred by relying upon the Medical-Vocational Guidelines (id. at 23-26).

Defendant responds that the ALJ properly assessed the opinions of plaintiff's treating physicians, did not err in assigning greater to weight to Dr. Kushner's opinion, as the ALJ is "not saddled with the 'impossible burden of mentioning every piece of evidence' in the record[,]" the treating opinions were inconsistent with other record evidence, and the ALJ properly characterized plaintiff's activities of daily living (Dkt. #17, Brief, at 13-20)(citation omitted); the ALJ's assessment of plaintiff's mental impairment is supported by substantial evidence (id. at 20-25); the ALJ conducted a sufficient credibility analysis (id. at 25-26); and the ALJ properly found that plaintiff could perform other work that existed in significant numbers in the national economy.  (Id. at 26-30).

In his reply brief, plaintiff asserts that in the face of uncontradicted and overwhelming evidence documenting disability, the opinions of non-examining physicians are entitled to little weight; there is no authority for the Commissioner's position that ALJs are permitted to entirely ignore the probative opinions of treating sources; and the ALJ did not assess plaintiff's mental RFC, nor does the Commissioner point to any evidence that shows he had no psychiatric limitations. (Dkt. #18, at 1-3).

A. TREATING PHYSICIAN RULE

In her decision, the ALJ concluded that "between [the] contemporaneously recorded treatment notes [of Drs. Campbell and D'Mello, and Sugarman, plaintiff's therapist,] and purpose-driven letters of support, the undersigned find more candor and credibility in the former." (Tr. 14).  The ALJ then "gave substantial weight" to the opinion of Dr. Kushner,

who reviewed plaintiff's medical record in June 2008. (Tr. 15). While the ALJ's opinion is devoid of any explanation as to why she rejected the opinions of plaintiff's long-standing treating physicians and treating therapist,[23] the ALJ stated that she assigned such weight to Dr. Kushner's opinion because "he is familiar with the requirements of the Social Security Act, he has reviewed the claimant's medical record, and his opinions are supported by and are consistent with the entire medical record." (Tr. 15). This assessment was erroneous.

In his Medical Source Statement, completed two years prior to plaintiff's administrative hearing before ALJ Burlison, Dr. Kushner concluded that plaintiff could frequently lift and carry up to ten pounds and could occasionally lift and carry up to twenty pounds; plaintiff could sit for four hours, stand for one hour and walk for thirty minutes at a time, and could sit for six hours, stand for two hours and walk for one hour in an eight hour workday. (Tr. 474-75).[24] No where in his statement did Dr. Kushner cite medical evidence he reviewed or upon which he relied in rendering his opinion.

"The opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with the other substantial evidence." Rosa v. Callahan, 168 F.3d 72, 78-79 (2d Cir. 1999)(multiple citations omitted); see 20 C.F.R. §

_____

[23]As discussed further below, in addition to the acceptable medical sources, the ALJ may also rely on other medical and non-medical sources "to show the severity of [the individual's] impairment(s) and how it affects [the individual's] ability to work." 20 C.F.R §§ 404.1513(d), 416.913(d). These sources include "nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists[.]" See 20 C.F.R §§ 404.1513(d)(1), 416.913(d)(1).

[24]Presumably relying on plaintiff's intake form completed in late 2007, Dr. Kushner opined that plaintiff could travel, ambulate, walk a block, use public transportation, climb a few steps, prepare simple meals, care for his personal hygiene, and sort, handle, and use paper files. (Tr. 479). Additionally, as stated above, Dr. Kushner found that plaintiff could climb stairs, balance, stoop, kneel, crouch and crawl occasionally, and could never climb ladders and scaffolds. (Tr. 477). Plaintiff could frequently move mechanical parts, operate a motor vehicle, be in humidity, wetness, dust, odors, fumes and extreme cold, but could only occasionally be exposed to extreme heat and could never be in unprotected heights. (Tr. 478).

404.1527 (d)(2)(when the ALJ "find[s] that a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence, . . . [the ALJ] will give it controlling weight.").[25]  In addition to the acceptable medical sources, the ALJ may also rely on other medical and non-medical sources "to show the severity of [the individual's] impairment(s) and how it affects [the individual's] ability to work." 20 C.F.R. §§ 404.1513(d), 416.913(d).  These sources include "nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists[.]"  See 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).  Under the treating physician rule, an ALJ assigns weight to the a treating source's opinion after considering:

> (i) the frequency of the examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004), citing 20 C.F.R. § 404.1527(d)(2); see also Perillo v. Astrue, 516 F. Supp. 2d 206, 208 (D. Conn. 2007), citing SSR 06-03p ("Though these factors explicitly apply only to opinions from 'acceptable medical sources,' they also can be applied to opinions of 'other sources,' such as therapists.").  In other words, an ALJ may give more weight to examining sources, and the ALJ must also consider the treatment relationship which would "provide a detailed, longitudinal picture" of plaintiff's impairment,

---

[25]The term "acceptable medical source" includes: 1) licensed physicians; 2) licensed or certified psychologists; 3) licensed optometrists; 4) licensed podiatrists; or 5) qualified speech-language pathologists. 20 C.F.R § 404.1513(a).  Only "acceptable medical sources" may establish the existence of a medically determinable impairment, see 20 C.F.R. §§ 404.1513(a), 416.913(a), can give medical opinions, see 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2), and can be considered treating sources whose opinions are entitled to controlling weight.  See 20 C.F.R. §§ 404.1527(d), 416.927(d).

along with the length of the treatment relationship and frequency of examination. 20 C.F.R. § 404.1527(d)(2); see Green-Younger v. Barnhart, 335 F.3d 99, 106-07 (2d Cir. 2003)(more weight should be assigned to opinion of doctor who coordinated three years of treatment). These factors weigh in favor of crediting the opinions of Drs. Campbell and D'Mello.

Medical opinions are "opinions on the issue(s) of the nature and severity of an individual's impairment(s)." SSR 96-2p, 1996 WL 374188, at *2 (S.S.A. July 2, 1996). However, "some kinds of findings--including the ultimate finding of whether a claimant is disabled and cannot work--are reserved to the Commissioner. . . . [T]he Social Security Administration considers the data that physicians provide but draws its own conclusions as to whether those data indicate disability."   Snell v. Apfel, 177 F.3d 128, 133 (2d Cir.1999)(internal citations and quotations omitted).  Thus, "although a treating physician's opinion on the 'ultimate legal issue of disability' does not carry any special significance, . . . a treating physician's opinion regarding 'the nature and severity' of a claimant's disability is entitled to some deference. . . ." Hardesty v. Astrue, No. 3:10 CV 333(MRK), 2011 WL 833611, at * 6 (D. Conn. Mar. 3, 2011), citing 20 C.F.R. §§ 416.927(e)(1), 404.1527(d)(2). While Dr. Campbell, a specialist, offered an opinion that plaintiff was "totally disabled because of this condition[,]" his opinion is substantiated by his contemporaneous treatment records, and, as he stated in his January 24, 2008 letter, plaintiff's diagnosis of sclerosing mesenteritis has been "proven[,]" and such an illness can cause "severe abdominal pain and is quite difficult to treat."  (Tr. 383, 447, 726).  Plaintiff was given Thalidomide and Tamoxifen, along with a combination of Oxycontin and Oxycodone, in an attempt to treat his pain, and yet he experienced minimal, if any, relief, and even after treating plaintiff for a year and a half, Dr. D'Mello, who had reservations about the amount of addictive pain medication he prescribed for plaintiff, expressed concern that he was "not competent enough to help

with [plaintiff's] pain management[.]" (Tr. 717).[26]  Like Dr. Campbell, D'Mello also opined that plaintiff is unable to sustain a competitive full-time job as a result of his sclerosing mesenteritis, and his conclusion, as discussed further below, was also supported by his treatment records.  (Tr. 845).

As detailed in Section II. supra, this case is remarkable for the consistency of treatment, the record of the severity of plaintiff's depression, which includes four serious attempts at suicide, and objective medical tests that support plaintiff's complaints of disabling pain.  Plaintiff saw Drs. D'Mello and Campbell for the entire three years from which this medical record is comprised, and the medical records and the treating physicians' opinions are supported by objective CT scans, colonoscopy results, clinical and diagnostic evidence of abdominal and left flank pain with tenderness upon palpitation, pentetreotide scan results, and biopsy results following a laparotomy.  (See, e.g., Tr. 223, 235-36, 239-40, 247-50, 254-55, 264-65, 267-68, 283, 308, 375-76, 389, 394-95, 433-36, 438-39, 443-44, 728, 827-28).  During the first half of 2009, plaintiff also was seen regularly by Dr. Flock and Dr. Cha at Yale-New Haven Hospital, whose examinations, diagnostic investigation, opinions, and discouraging prognoses were consistent with those of plaintiff's local doctors, Drs. D'Mello and Campbell; Dr. Cha even consulted with Dr. Pardi, an "expert" on this disease at the Mayo Clinic.  (Tr. 834-36, 830-33, 841-43, 826).[27]

Defendant is correct that it is the "ALJ, who must weigh all of the evidence to determine whether a claimant is disabled, . . . [and] is entitled to piece together the relevant

---

[26]In fact, as Dr. Floch of Yale-New Haven Hospital opined on March 17, 2009, plaintiff's "pain [was] poorly maintained on a daily regime of OxyContin and oxycodone[.]" (Tr. 834).

[27]Doctors consistently have referred to plaintiff's condition as an "unusual" case.  (See, e.g., Tr. 247, 253, 301, 728).

medical facts from the findings and opinions of multiple physicians[.]" (Dkt. #17, Brief at 15)(multiple citations and internal quotations omitted). However, other than crediting Dr. Kushner's opinion and focusing on the "inconsistencies" in the non-medical evidence,[28] which she factored into her credibility determination (see Tr. 14-15), and used as support for assigning little weight to the treating physicians' opinion, the ALJ did not address her treatment of plaintiff's treating physicians' and treating therapist's contemporaneous notes, nor did she list the reasons for discrediting their opinions. Halloran, 362 F.3d at 32 (the Commissioner must give good reasons for his notice of determination or decision for the weight given to a plaintiff's treating source's opinion)(citations & internal quotations omitted). A failure by the ALJ to provide "good reasons" for the weight accorded the opinions of treating physicians may justify a remand. Gunter v. Comm'r of Soc. Sec., 361 Fed. Appx. 197, 199-200 (2d Cir. 2010)(summary order).

Moreover, in her decision, the ALJ rejected the treating providers' opinions by focusing on plaintiff's "allegations[,]" which she described as "partially credible[,]" adding that the "evidence contain[ed] inconsistencies." (Tr. 14).[29] While the opinions of non-examining sources can override the treating sources' opinions, they must be supported by evidence in the record. Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993). However, rather than finding support for Dr. Kushner's opinion in the record, Dr. Kushner's opinion conflicts with the otherwise consistent record, which is scarcely referenced by the ALJ, of plaintiff's disabling pain, fatigue, sleep disturbance, and depression documented by plaintiff's treating physicians and his therapist. As the Second Circuit has made clear, "while

---

[28]See Section IV.C. infra.

[29]See Section IV.C. infra.

contradictions in the medical record are for the ALJ to resolve, they cannot be resolved arbitrarily," Gunter, 361 Fed. Appx. at 200 (internal citations omitted), and the ALJ's insistence, without support, that Dr. Kushner's opinion was "supported by and [was] consistent with the entire medical record" (Tr. 15), simply does not suffice. Gunter, 361 Fed. Appx. at 200 ("the ALJ's incantatory repetition of the words 'substantial evidence' gives us no indication at all of why he chose to credit the opinions of the consulting physicians over that of [the treating physician].").

Further, while Sugarman's opinion cannot be afforded controlling weight, it is entitled to consideration and weight as a medical source. His opinion that plaintiff is not capable of withstanding even low stress jobs (Tr. 743), and that plaintiff is totally disabled without consideration of his drug and/or alcohol abuse, is supported by his treatment records and the overlapping records from plaintiff's hospitalizations after his suicide attempts. (Compare Tr. 738 with Tr. 737-823, 846-906). Sugarman rated plaintiff as markedly limited in his ability to complete a normal work week without interruptions from psychologically based symptoms, to perform at a consistent pace, and to set realistic goals or make plans independently, and he opined that plaintiff would have frequent absences from work. (Tr. 741-42, 744). Further, as stated in Section II. supra, Sugarman offered an opinion that went directly to the nature and severity of plaintiff's depression. 20 C.F.R. § 416.927(e)(2)("We use medical sources . . . , to provide evidence, including opinions, on the nature and severity of your impairment(s)."). According to Sugarman, "[i]f [plaintiff's] sclerosing mesenteritis [was] treatable, [plaintiff's prognosis was] fair to good for the depression[, and] [i]f not, suicide [was] highly probable. Either way, opioid alcohol dependence [would] be a life-long challenge." (Tr. 737)(emphasis in original). Additionally, Sugarman characterized plaintiff's clinical findings supporting his diagnosis as appetite disturbance with weight change, sleep

36

and mood disturbance, emotional lability, substance dependence, anhedonia, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased anxiety and generalizes persistent anxiety.  (Tr. 738).

Sugarman noted that plaintiff was "wracked with intense physical pain, obsessed with trying to numb it, [and] preoccupied with thoughts of suicide[,]" (Tr. 742), and plaintiff's "[e]xtreme physical pain leads him to drug-seeking behavior, followed by over-use of pain med[ication][.]" (Tr. 743).  Sugarman concluded that if plaintiff's physical condition was "successfully treated (and no cure currently exists)[,] he [would] only be challenged by his opioid dependence[, but] [i]f the sclerosing mesenteritis [could not] be stopped from progressing, and the pain can't be managed[,] [plaintiff's] <u>next</u> suicide attempt . . . [would] most likely kill him." (Tr. 744)(emphasis in original).[30]  Similarly, Sugarman's observations, diagnoses, and grim prognoses are entirely consistent with those of the numerous mental health professionals who treated plaintiff during his <u>multiple in-patient hospitalizations with regard to his four suicide attempts over a nineteen-month period</u>, from late July 2008 through mid January 2010, in addition to threats of suicide.  (Tr. 1092-96, 1101-07, 1090-91, 629-74, 682-88, 691-94, 696-700, 1056-80, 990-1037, 907-14, 960-89, 923-59; <u>see also</u> Tr. 366, 369, 357, 359, 223, 342, 470, 492-528, 922).   The ALJ"s decision, however, does not reflect what consideration, if any, she gave to Sugarman's opinion.

### B. ALJ'S TREATMENT OF PLAINTIFF'S MENTAL IMPAIRMENT AND APPLICATION OF THE MEDICAL-VOCATIONAL GUIDELINES

The ALJ concluded that plaintiff's depression is severe and resulted in moderate

---

[30]Additionally, in a letter to Dr. Pardi, dated November 5, 2009, Sugarman opined that he was "fairly confident, after forty years as a trauma therapist, that if [plaintiff's sclerosing mesenteritis] [could not] be satisfactorily treated, this addict's personality WILL take him down in the very near future."  (Tr. 906)(emphasis in original).

restrictions in his daily activities, his social functioning, and his concentration, persistence or pace, and caused three of more episodes of decompensation, each of extended duration. (Tr. 10).[31] However, plaintiff contends that despite her findings, the ALJ failed to incorporate any of these specific mental limitations into her RFC[32] determination and consider the limitations at the remaining steps of the sequential disability process. (Dkt. # 12, Brief at 18).

"The Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix II, Rules 200-204, are a shorthand way of evaluating vocational factors that take into consideration a claimant's age, education, and previous work experience." Bethea v. Astrue, No. 3:10 CV 744(JCH), 2011 WL 977062, at *13 (D. Conn. Mar. 17, 2011). "Mental disabilities such as depression are nonexertional limitations[,]" as is pain, as both affect the ability to meet the certain work demands. Id, at *14, citing 20 C.F.R. § 404.1569a(c)(1).

As the Second Circuit held in Bapp:

> [T]he mere existence of a nonexertional impairment does not automatically . . . preclude reliance on the guidelines. A more appropriate approach is that when a claimant's nonexertional impairments significantly diminish his ability to work--over and above any incapacity caused solely from exertional limitations--so that he is unable to perform the full range of employment indicated by the medical vocational guidelines, then the Secretary must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.

---

[31]The relevant Listing in this case is § 12.04 Affective Disorders, which requires that in addition to meeting the Part A criteria, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04A, plaintiff must also satisfy the Part B criteria which requires at least two of the following: marked restrictions of activities of daily living, marked difficulties maintaining social functioning, marked difficulties in maintaining concentration, persistence, or pace; or a marked limitation in one of the areas with repeated episodes of decompensation each of extended duration. 20 C.F.R. 404, Subpt. P., App. 1 § 12.04B.

[32]"Residual functional capacity" is what a person is still capable of doing despite limitations resulting from her physical and mental impairments. See 20 C.F.R. § 416.945(a).

<u>Bapp</u>, 802 F.2d at 603.  When a claimant's nonexertional impairments "significantly

diminish"[33] the range of work allowed by the claimant's exertional limitations, the use of the

Grids at step five in the sequential analysis is inappropriate. <u>Id.</u> at 605-06.

In her decision, the ALJ made the sweeping conclusion that plaintiff's "additional

limitations have little or no effect on the occupational base of unskilled sedentary work[,]"

and thus she applied the Grids to reach a conclusion of "'not disabled' . . . under the

framework of this rule." (Tr. 16).  SSR 96-9p, 1996 WL 374185 (July 2, 1996) provides:

> 1. An RFC for less than a full range of sedentary work reflects very serious
> limitations resulting from an individual's medical impairment(s) and is
> expected to be relatively rare.
>
> 2. However, a finding that an individual has the ability to do less than a full
> range of sedentary work does not necessarily equate with a decision of
> "disabled." If the performance of past relevant work is precluded by an RFC
> for less than the full range of sedentary work, consideration must still be
> given to whether there is other work in the national economy that the
> individual is able to do, considering age, education, and work experience.

<u>Id.</u> at *1.

Consistent with SSR 96-9p, vocational expert testimony is necessary to determine

whether there is other work in the national economy that an individual with the ability to do

less than the full range of sedentary work may perform.  Moreover, while the ALJ references

"additional limitations[,]" which she concluded have "little or no effect on the occupational

base of unskilled sedentary work," the Court is left guessing as to which limitations the ALJ

is referring.  As discussed thoroughly in Sections II and IV.A <u>supra</u>, the medical record

certainly evidences additional limitations of pain, weakness, fatigue, sleep deprivation, and

depression, all of which would result in "additional loss of work capacity beyond a negligible

---

[33]The Second Circuit defined "significantly diminish" as "the additional loss of work capacity
beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work
as to deprive him of a meaningful employment opportunity." <u>Id.</u> at 606 (footnote omitted).

one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity," so as to "significantly diminish" plaintiff's work capacity beyond that caused by his exertional impairments. Accordingly, the application of the Grid was inappropriate, and the ALJ erred in not hearing vocational expert testimony at the hearing.

## C. ALJ'S CREDIBILITY DETERMINATION

The ALJ noted that plaintiff "stated that from the alleged onset date until April 2007, he collected sick pay; and from April 2007 through October 2007, he collected unemployment benefits[,]"[34] and she emphasized the latter point in concluding that by virtue of plaintiff's

---

[34]Plaintiff seeks benefits for an onset date of January 18, 2007. (Tr. 98, 141). Plaintiff was seen by Dr. Graves in December 2006 and late January 2007 for chest pain from pneumonia, persistent dyspnea and abnormal liver enzymes, for which plaintiff would undergo an abdominal ultrasound and a chest x-ray. (Tr. 269, 291, 344-45, 350, 1127, 1132). Although plaintiff was cleared to return to work after both of these appointments (Tr. 343, 349), two days after Dr. Graves thought that plaintiff could return to work in his usual capacity, plaintiff was seen by Dr. D'Mello as he was "still not feeling well[,]" and on February 6, 2007, he returned to Dr. Graves with complaints of fatigue with myalgias and abdominal discomfort, as well as depression. (Tr. 223-24, 342, 350). Plaintiff continued to see Dr. D'Mello, and then Dr. Campbell, for fatigue, abdominal pain and weakness on a bi-weekly and then weekly basis while the doctors were examining the source of plaintiff's persistent ailments. (See Tr. 219, 222, 257-60, 304-06, 336, 403-04, 539-40, 547-49, 588-89, 596-97). On February 23, 2007, a CT scan of plaintiff's abdomen revealed "abnormal stranding in the mesentery[.]" (Tr. 239-40, 267-68). On March 1, 2007, Dr. D'Mello excused plaintiff from work due to his illness (Tr. 339), and on April 4, 2007, an MRI of plaintiff's lumbar spine revealed a small right paracentral L4 disc herniation and mild bulging of the L5 disc. (Tr. 266). Plaintiff continued to complain of pain in his abdominal wall (see Tr. 215, 256-57), and Dr. D'Mello noted again that plaintiff was unable to work as of April 12, 2007. (Tr. 335). On May 10, 2007, Dr. D'Mello cleared plaintiff to return to work on "light duty[,]" (id.), but nineteen days later, plaintiff returned with complaints of worsening pain. (Tr. 334).

By July 2007, after plaintiff had been seen regularly by Dr. Campbell through the month of June and had undergone a second CT scan of his abdomen, Dr. Reisfeld, a surgeon, reviewed plaintiff's scans and stated that he "believe[d] that the findings on the CT scan[s] [were] the cause of [plaintiff's] chronic abdominal pain[,]" which pain had been documented in plaintiff's medical records since February 6, 2007, and plaintiff was first referred for an abdominal ultrasound on December 22, 2206. (Tr. 728; see Tr. 342, 350). Thus, while plaintiff was cleared to return to work at some isolated points immediately prior to and closely following his onset date, plaintiff did not perform any substantial gainful activity (as recognized by the ALJ (Tr. 9)), and in fact, the record does not reflect that he worked at all, but instead, he continued to complain of abdominal pain while he underwent further testing and examination to reach the ultimate diagnosis to which his pain was attributed.

40

receipt of unemployment benefits, for which the applicant must be "ready, willing, and able to work[,]" plaintiff "[t]herefore, . . . could not have been disabled during that time period." (Tr. 14)(footnote added).  The ALJ's treatment of plaintiff's collection of unemployment was erroneous.

As stated in an SSA Memorandum, dated August 9, 2010, "[r]eceipt of unemployment benefits does not preclude the receipt of Social Security disability benefits[,]" but rather, "is only one of the many factors that must be considered in determining whether the claimant is disabled."  (Dkt. #12, Exh. A).  Additionally, as stated in the Memorandum, "ALJs should look at the totality of the circumstances in determining the significance of the application for unemployment benefits and related efforts to obtain employment."  (Id.).  Rather than follow the intent of the Agency Memorandum, the ALJ in this case relied upon plaintiff's receipt of benefits to conclude that "[t]herefore, the claimant could not have been disabled during that period."  (Tr. 14).

The ALJ also considered that "[a]lthough the claimant testified that his tumor is inoperable, the evidence suggests . . . that surgery . . . is an option . . ., but the evidence does not show that the claimant has elected to pursue surgical treatment."  (Id.).  The ALJ has completely misconstrued the evidence in this administrative record on this issue.  Dr. Cha, an assistant professor of surgery in the Gastrointestinal Surgery and Surgical Oncology Department of Yale-New Haven Hospital, stated that, in his opinion, he would "avoid surgery unless emergent" because only about ten percent of patients benefit from the surgery, he was "not confident" that he would be able to palliate plaintiff's symptoms of pain, and there would be a "high risk of surgical complications."  (Tr. 830).  Dr. Cha's consultation with Dr. Pardi, an "expert on sclerosing mesenteritis" at the Mayo Clinic, led to no other suggestions for treatment.  (Tr. 830-31).  Consistent with Dr. Cha's medical opinion, plaintiff testified at

his hearing before the ALJ that his doctors have been trying to treat him with "many different medications to try to stop the progression of the necrosis . . .[,]" as surgery is "too dangerous." (Tr. 33). However, rather than relying on the medical opinion in the record, the ALJ erroneously substituted her own judgment for that of a prominent medical professional. Gunter, 361 Fed. Appx. at 199 ("It is well-settled that an ALJ cannot substitute her own judgment for that of a medical professional.")(citation omitted). Furthermore, the ALJ erred in discrediting plaintiff for not undergoing surgery as there is no "failure" to follow prescribed treatment if the "treating source decides against surgery," as was the case here, and there is no evidence that the surgery "was expected to restore [plaintiff's] ability to work." SSR 82-59, 1982 WL 31384, at *3 (S.S.A. 1982).[35]

## V. CONCLUSION

It is within the province of this court to "set aside the ALJ's decision only where it is based upon legal error or is not supported by substantial evidence." Balsamo, 142 F.3d at 79. In this case, the ALJ erred in failing to consider the opinions of plaintiff's treating physicians, in failing to provide reasons for rejecting such opinions, and in assigning more weight to the state agency consultant whose opinion was not supported by substantial evidence of the record; the ALJ erred in her reliance on the Medical-Vocational Guidelines without consideration of whether plaintiff's additional nonexterional limitations significantly

---

[35]Plaintiff also asserts that the ALJ erred "by suggesting that [plaintiff's] mental impairments may be a result of his substance abuse." (Dkt. #12, Brief at 20). In her decision, the ALJ concluded that "[n]otwithstanding the evidence of [plaintiff's] medically determinable severe mental impairments, there is no clear separation of the impairments and substance abuse." (Tr. 14). 42 U.S.C. § 423(d)(2)(C) provides that "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." The "key factor" used to determine whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether the claimant would still be found disabled if he stopped using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1). In this case, the ALJ never found plaintiff disabled, so that any analysis of whether plaintiff's substance abuse was a contributing factor is misplaced.

diminish his work capacity; and the AJ's credibility assessment was not consistent with the other evidence in the record. Accordingly, the Court concludes that the decision of the Commissioner was not supported by substantial evidence and should be reversed and the case remanded for a calculation of benefits. See Hedman-Ouellete v. Social Security Admin., 3:07 CV 1462(PCD), 2009 WL 497605, at *24 (D. Conn. Feb. 24, 2009); Weihler v. Barnhart, No. 3:05 CV 1576(SRU)(WIG), 2007 WL 840085, at * 17 (D. Conn. Feb. 9, 2007).

For the reasons stated above, plaintiff's Motion for Order to Reverse the Decision of the Commissioner (Dkt. #12) is granted, and defendant's Motion to Affirm the Decision of the Commissioner (Dkt. #17) is denied.

The parties are free to seek the district judge's review of this recommended ruling. See 28 U.S.C. § 636(b)**(written objection to ruling must be filed within fourteen calendar days after service of same)**; FED. R. CIV. P. 6(a) & 72; Rule 72.2 of the Local Rule for United States Magistrate Judges, United States District Court for the District of Connecticut; Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit)**.

Dated at New Haven, Connecticut, this 4th day of August, 2011.


　/s/ Joan G. Margolis, USMJ　
Joan Glazer Margolis
United States Magistrate Judge